## U.S. BANKRUPTCY COURT
### District of South Carolina

Case Number:  **19-06512-jw**
Adversary Proceeding Number:  **20-80027-jw**

## ORDER

The relief set forth on the following pages, for a total of 21 pages including this page, is hereby ORDERED.

---

**FILED BY THE COURT**
**09/15/2020**



_John E Waites_

US Bankruptcy Judge
District of South Carolina

Entered: 09/15/2020

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| In re,<br><br>Brian James Macdonald,<br><br>                     Debtor. | C/A No. 19-06512-JW<br><br>Adv. Pro. No. 20-80027-JW<br><br>Chapter 13 |
| Michael Furlow<br>Cathy Furlow,<br><br>                     Plaintiffs,<br><br>v.<br><br>Brian J. Macdonald,<br><br>                     Defendant. | **ORDER** |

This matter comes before the Court for trial in the above-captioned adversary proceeding between Michael and Cathy Furlow ("Plaintiffs") and Brian J. Macdonald ("Defendant") regarding a request to partition certain real property better known as 5718 Captain Kidd Road in Hollywood, South Carolina ("Charleston Property") and a claim for unjust enrichment regarding Plaintiffs' payment of taxes, insurances and homeowners' association dues. This adversary proceeding originated in the Court of Common Pleas for the Ninth Circuit ("State Court") before being removed to the Bankruptcy Court through a consent order of the parties as the proceeding relates to matters involving the administration of claims and the confirmation of a chapter 13 plan in Defendant's bankruptcy case (C/A No. 19-06512-jw). The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Further, the parties have consented to the entry of final judgments in this proceeding by the Bankruptcy Court. Pursuant to Fed. R. Civ. P. 52,

which is made applicable to this proceeding by Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

1.      Defendant was Plaintiffs' son-in-law by virtue of his marriage to Plaintiff's daughter ("Mrs. Macdonald") prior to her death in February of 2020.

2.      It appears that Plaintiffs have significant means and have generously benefitted their children and their families through trust funds, the payment of educational expenses and housing costs. Mr. Furlow spent most of his career as a successful real estate developer. Since 2004, Plaintiffs assisted Defendant and Mrs. Macdonald (collectively the "Macdonalds") with a series of purchases of real estate to be used as the residence for the Macdonalds and their children. Specifically, in 2004, Plaintiffs offered to assist the Macdonalds with the purchase of a new house in Miami, Florida in order to ensure the Macdonalds lived in a bigger and better home in a desirable school district for their children. As a result, Plaintiffs and Macdonalds agreed to purchase an approximately $800,000 home in Miami, Florida ("Miami Property"). According to the testimony of Mr. Furlow, he contributed half of the purchase price for the Miami Property in exchange for a one-half interest, while the Macdonalds received a one-half interest by contributing the remaining portion of the purchase price from their savings and a mortgage loan. Testimony also indicated that Plaintiffs contributed significantly in updating the home, sharing those expenses equally with the Macdonalds. Mr. Furlow testified that a written agreement was entered between the parties which documented the terms of their agreement for the Miami Property; however, a copy of the agreement was not submitted into evidence.

---

[1]      To the extent the following findings of fact constitute conclusions of law, they are adopted as such and vice versa.

3.    During the time that the Macdonald family resided in the Miami Property, Mrs. Macdonald developed substance abuse problems. Defendant testified that in 2008, in an effort to provide Mrs. Macdonald a new environment to better address her problems and because Defendant received a federal contracting job offer, the Macdonalds moved to Virginia. Defendant testified that his new job allowed Mrs. Macdonald to no longer work as an attorney, the pressures from which he believed had been contributing to her substance abuse problems. Again, Plaintiffs assisted with the purchase of a home for the Macdonalds' residence in Virginia ("Virginia Property"). Mr. Furlow testified that the proceeds from the sale of the Miami house were "rolled over" and used for the purchase of the Virginia Property with Mr. Furlow and the Macdonalds each having a one-half interest. Plaintiffs submitted into evidence an <u>unsigned</u> copy of a written agreement regarding the Virginia Property which provided that Mr. Furlow held a 55% interest in the property and would receive that portion of any sale of the Virginia Property if the sale was for a reasonable market value. Mr. Furlow testified that the written agreement was signed by the Macdonalds. While Defendant does not dispute such arrangements for the Miami Property and Virginia Property, he did not recall signing any said agreements.

4.    It appears Plaintiffs had a similar arrangement with Mrs. Macdonald's sister. Specifically, on three occasions, Plaintiffs assisted Mrs. Macdonald's sister and the sister's spouse with the purchase of a series of real properties that were to serve as the residence for the sister's family. On each occasion the sister and her family moved into a better house. Mr. Furlow testified that Plaintiffs would contribute one-half of the purchase price in exchange for a one-half interest in the real property. Ultimately, as to the most recently purchased property, referred to as the "dream house" for that daughter's family, Plaintiffs quitclaimed their interest in the property to

Mrs. Macdonald's sister and the sister's spouse without consideration, effectively gifting them total ownership of the property.

5.      It appears Mrs. Macdonald's substance abuse problems continued to escalate in Virginia, and she no longer worked as an attorney. In addition, Defendant suffered a work-related injury, resulting in the family's income being limited to his retirement disability benefits, which Defendant testified was approximately $30,000 per year.

6.      Defendant testified that despite the Macdonalds' meager resources at that point, Plaintiffs enticed the Macdonalds to move to South Carolina in order to purchase a "dream house" with deep water accessibility in the amount of approximately $1.2 million near Plaintiffs' home in the hope that moving closer to her parents might alleviate some of Mrs. MacDonald's problems.

7.      On August 26, 2015, a deed was executed conveying the Charleston Property to Plaintiffs and the Macdonalds as tenants-in-common ("Deed").[2] The entire purchase price of the Charleston Property (approximately $1.2 million) at the time of the closing was paid by Plaintiffs without a mortgage loan. The Deed provides no further information regarding the co-tenants' share of the Charleston Property, and there was no separate written agreement addressing its purchase and the parties' respective interests.

8.      Defendant testified that he never agreed to pay a 25% share of the purchase price nor had any discussions with either of the Plaintiffs regarding payment for this "dream home" prior to the closing of the Charleston Property.  Defendant also testified that Plaintiffs had told him to consider it a gift and that at some "magical moment," the Plaintiffs would quitclaim the entire interest of the Charleston Property to the Macdonalds in a similar fashion as they had done with Mrs. Macdonald's sister.

---

[2]      On this occasion, for the first time, the deed for the Charleston Property listed Mrs. Furlow as a co-tenant in addition to Mr. Furlow and the Macdonalds.

9.      Defendant also testified that there was no expectation that the Macdonalds pay one-half of the value of the Charleston Property and that at the time of the closing and when he moved to South Carolina, the Macdonalds did not have the resources and would not have qualified for a mortgage of one-half the value of the Charleston Property, as the family's income was limited to his disability retirement income, which amounted to approximately $30,000 a year, a fact known to the Plaintiffs. Defendant stated that, due to her substance abuse problems, Mrs. MacDonald had not worked since they had moved to Virginia in 2008 and that he had significant difficulty finding a federal contracting job in the Charleston area. As a result, he drove for Uber for income after they had moved to South Carolina.[3] Defendant testified that he suggested that he not be included on the Deed, but that Mr. Furlow insisted that he be listed as a tenant-in-common in order to "appreciate the ownership of the property."

10.      Conversely, Plaintiffs testified that the parties agreed that Defendant and Mrs. MacDonald would contribute 50% of the purchase price for the Charleston Property in exchange for the deeded interest. Specifically, Mr. Furlow testified that the expectation was that Defendant and Mrs. MacDonald's share ($610,635.50) would be paid from the proceeds of the sale of the Virginia Property, which was anticipated to be approximately $300,000 when the Charleston Property was purchased, and by their obtaining a mortgage loan for the remaining balance of approximately $300,000.  Mr. Furlow testified that the parties agreed to abide by a similar arrangement that had been in place for the Virginia Property and Miami Property. However, unlike his testimony regarding the agreements for those properties, Mr. Furlow admitted that no written

---

[3]      He testified that he was recently hired within the last year as a federal contractor with the U.S. Coast Guard, which Defendant indicated provided about two-thirds the income he had made when he worked in Virginia.

agreement was drafted or signed between Plaintiffs and the Macdonalds for the Charleston Property.

11.    There is no dispute that Plaintiffs had no intention to occupy, use, live in or benefit by the Charleston Property and that the intention upon its purchase was for the property to provide a home for the Macdonalds and their children.

12.    There was conflicting testimony from the parties about Plaintiffs' intent regarding the purchase of the Charleston Property. While both Mr. and Mrs. Furlow testified that their contribution to the purchase price was an investment, Mrs. Furlow indicated that she did not ever expect a beneficial interest in the Charleston Property and that there always was a contemplation to eventually gift their interest in the property to Mrs. Macdonald and Defendant but that "they had not reached that point yet."[4]

13.    In August 2016, one year after the closing of the Charleston Property, the Virginia Property eventually sold, producing net proceeds of only $77,589, which were given to Plaintiffs. Plaintiffs allege that the $77,589 represents the Macdonald's only contribution to the purchase price of the Charleston Property and therefore, based on the purported agreement only entitled them to an interest in proportion to their contribution of the purchase price or 6.35%.

14.    Throughout this time, Plaintiffs paid for all of the education costs for the Macdonalds' children, and Defendant testified that Plaintiffs had promised to pay such education expenses until such time as the children completed their education at whatever level they desired, including graduate school tuition.[5] In addition, Plaintiffs had established trust funds for Mrs. Macdonald and her sister. Further, Defendant testified that he was advised by Plaintiffs not to

---

[4]    While Mrs. Furlow also indicated that she and her husband wished a return of their investment, this appears contradicted by their prior pattern of conduct with their children.

[5]    However, due to the litigation, Plaintiffs have apparently discontinued the payment of educational expenses for the Macdonalds' children.

worry about saving for the children's education or his retirement because Plaintiffs would take care of those matters.

15.    In 2018, as a result of Mrs. Macdonald's substance abuse problems being reported to the school by her children, the South Carolina Department of Social Services ("DSS") intervened and required Mrs. Macdonald to leave the Charleston Property, which Plaintiffs characterized as Defendant "throwing Ms. Macdonald out of the house." Apparently, Mrs. Macdonald then moved in with Plaintiffs. In addition, Mrs. Macdonald filed for divorce on February 21, 2018. In her divorce complaint and as part of a temporary consent order entered by the Family Court, Mrs. Macdonald consented to Defendant having custody of the Macdonald's children and to Defendant's continued and exclusive occupancy of the Charleston Property.

16.    Within a month thereafter, on March 19, 2018, Plaintiffs retained counsel and filed a complaint against Defendant and Mrs. Macdonald in the State Court ("Partition Lawsuit") seeking to recover their interest in the Charleston Property. The complaint included a cause of action for partition and a request for attorney's fees and costs for bringing the lawsuit.

17.    On April 11, 2018, Mrs. Macdonald, while in the care and support of Plaintiffs, executed a quitclaim deed of her interest in the Charleston Property to the Plaintiffs for consideration in the amount of $38,794.50, purportedly one-half of the proceeds paid to Plaintiffs from the sale of the Virginia Property. However, the quitclaim deed was not recorded in the public records of Charleston County until October 23, 2018. Plaintiffs testified that the delay in the recording of the quitclaim deed was at the request of Mrs. Macdonald who had reconciled with Defendant for a time after executing the quitclaim deed but who later permitted its recording when she subsequently separated from him again. It does not appear a divorce was ever finalized by the Family Court prior to Mrs. Macdonald's death in 2020.

18.     On September 25, 2018, Plaintiffs filed an amended complaint in the Partition Lawsuit that added an unjust enrichment cause of action seeking reimbursement for Plaintiffs' payment of taxes and insurance for the Charleston Property as well as seeking an award of past rent against Defendant and, despite the quitclaim deed, their daughter, Mrs. Macdonald. The claim of past rents was associated with a purported ouster of Plaintiffs from the Charleston Property, which the Plaintiffs asserted coincided with Mrs. Macdonald's removal from the Charleston Property by DSS and her separation from Defendant.

19.     On April 2, 2019, approximately one year after receipt of the quitclaim deed and purported consideration, Plaintiffs dismissed Mrs. Macdonald without prejudice from the Partition Lawsuit.

20.     Shortly before the scheduled trial for the Partition Lawsuit in State Court, Defendant filed a petition for relief under chapter 13 of the Bankruptcy Code (C/A No. 19-06512) on December 12, 2019.

21.     On January 13, 2020, Plaintiffs filed a motion for relief from stay to continue their prosecution of the Partition Lawsuit in state court.

22.     In February 2020, Mrs. Macdonald passed away.

23.     On March 16, 2020, this Court entered a consent order in which the parties agreed to remove the Partition Lawsuit to this Court in order for the Court to determine the Defendant's property interest in the Charleston Property as well as address the unjust enrichment cause of action as a prepetition claim asserted against Defendant. Accordingly, on March 20, 2020, the Partition Lawsuit was removed to this Court as an adversary proceeding.

24.     On June 23, 2020, after completing discovery, Defendant filed a motion for summary judgment as to Plaintiffs' request for rent for the alleged ouster under their unjust enrichment claim.

25.     On July 22, 2020, the Court entered a Pre-Trial Order, which included the parties' stipulated issues and facts for this proceeding.

26.     On July 27, 2020, the Court granted Defendant's motion for summary judgment as to the unjust enrichment claim for ouster and rents, finding that the record presented by Plaintiffs in the summary judgment proceedings failed to support a finding of ouster by Defendant.

27.     On August 24, 2020, the Court held an in-person trial on the remaining causes of action in the adversary proceeding. The parties presented the testimony of Mr. Furlow, Mrs. Furlow and Defendant as well as presented exhibits into evidence.

## CONCLUSIONS OF LAW

In the present matter, the Court is asked to address a dispute between cotenant family members regarding their rights and ownership of valuable real property. Other than the Deed, there were no written documents addressing the parties' respective interests. The facts of this proceeding are unfortunate, and the matter is overshadowed by the animosity between the parties as a result of the breakdown of familial relationships and Mrs. Macdonald's death. Ultimately, the Court is being asked to determine the extent of the parties' interest in the Charleston Property and, thereafter, accord relief based upon each party's share, including ordering reimbursement of certain expenses incurred in the maintenance of the property as well as a partition and sale of the property. Specifically, Plaintiffs assert that they possess a 96.83% interest in the Charleston Property based upon their payment of the purchase price less one-half of the amount of the proceeds they received from the sale of the Virginia Property a year after its purchase. Defendant

asserts that he possesses a 25% interest under the Deed on the basis of a presumptive deed share providing for equal ownership between the four cotenants. Further he alleges that under the circumstances existing at the time of purchase, there was no agreement that his interest was conditioned upon contributing a certain portion to the purchase price and that the parties intended his and Mrs. Macdonald's interest to be a gift until the entire interest in the Charleston Property was ultimately gifted to them.

Under South Carolina law, a partition is an action in equity, the procedures of which are set forth in the Partition section of the South Carolina Code (S.C. Code Ann. § 15-61-10, *et al.*). *See Laughon v. O'Braitis*, 602 S.E.2d 108, 110 (S.C. Ct. App. 2004) (indicating a partition is an action in equity). When a dispute is raised in a partition action, the court must first determine the parties' respective interests before proceeding with the partition. *See Marichris, LLC v. Derrick*, 682 S.E.2d 301 (S.C. Ct. App. 2009) (determining co-tenants' interests when disputed in a partition action).

## Determination of the Parties' Ownership Interests

The parties do not dispute that the Deed for the Charleston Property lists Plaintiffs and the Macdonalds as co-tenants but is otherwise silent as to their respective shares in the property. The parties also do not dispute that Plaintiffs paid the entire purchase price without a mortgage loan when the Charleston Property was purchased. The dispute is over what the parties intended as to the Macdonalds' interests when the property was purchased.

The primary published South Carolina opinion on this subject is *Marichris, LLC v. Derrick*, 682 S.E.2d 301 (S.C. Ct. App. 2009). In that case, the Court of Appeals of South Carolina, citing the *American Jurisprudence*, held that:

> "Where two or more persons take as tenants in common under an instrument silent as to their respective share, there is a presumption that their shares are equal.

> Ordinarily, this presumption is not conclusive but is subject to rebuttal and has at times been rebutted by parol evidence. A party challenging the presumption that property held in joint tenancy is equally owned has the burden of proof."

*Id.* at 305–06 (quoting 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 117 (2005)). It also held that "[t]his presumption may be rebutted where there is evidence of unequal contributions to the purchase price of the property." *Id.* (citing 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 117 (2005)).

Accordingly, *Marichris* recognized that the determination of the intent of the parties at the time of the property's purchase would be based on three notable criteria:

(1) If the deed of purchase is otherwise silent, it creates a presumption of equal shares;
(2) That presumption can be rebutted by evidence of unequal contributions to the purchase price and the consideration of other factors; and
(3) The burden of proof is on the party challenging the presumption.

Despite unequal contributions in the purchase price of the property (with one co-tenant providing 99.5% of the purchase price), the Court of Appeals for South Carolina in *Marichris* held that the co-tenants intended a 50/50 split in the real estate focusing on additional evidence and the intent of the parties at the time the property was purchased. *Id.* As the *Marichris* opinion highlights, the unequal contributions of co-tenants in purchasing a property is not conclusive that the parties intended for each party's interest to be proportionate to the party's contribution to the purchase price, but is only one piece of evidence in considering whether the parties intended an unequal share in the ownership of the property.

*Alleged Oral Agreement for the Charleston Property*

Central to Plaintiffs' arguments to rebut the presumption of equal shares is an alleged agreement that the Macdonalds were to contribute one-half of the purchase price of the property for their interests. Specifically, Plaintiffs allege that the purchase of the Charleston Property was under the same terms and arrangements as represented in written agreements regarding the

Virginia Property and Miami Property. In other words, Plaintiffs assert the Macdonalds' interest in the Charleston Property was conditioned upon a timely payment of a one-half portion of the purchase price, in this instance when the property was previously purchased by a repayment to Plaintiffs.  While Plaintiffs assert that they had separate written agreements as to the Virginia Property and Miami Property, they acknowledge that there is no written agreement for the Charleston Property. Defendant asserts there was no such agreement for the Charleston Property and that, to the extent Plaintiffs are seeking to enforce an agreement to repay them a portion of the purchase price of the property, it is barred by the statute of frauds.

The enforcement of any agreement regarding the disposition of real property is subject to the statute of frauds under South Carolina law. *See Smith v. McClam*, 346 S.E.2d 720 (S.C. 1986) (addressing whether a letter representing a parol agreement to not convey property until a grantee's death satisfied both the statute of frauds and parol evidence rule). Under South Carolina law, the statute of frauds provides that "[n]o action shall be brought whereby: . . . to charge any person upon any contract or sale of lands, tenements or hereditaments or any interest in or concerning them . . . [u]nless the agreement upon which such action shall be brought or some memorandum or note thereof shall be in writing and signed by the party to be charged therewith . . . ." S.C. Code Ann. § 32-3-10 (2020). Plaintiffs produced no emails, text messages, notes, letters or written expressions that indicated an intent for the Macdonalds to pay for one-half of the purchase price of the Charleston Property at the time of its purchase.

In the present matter, under the Plaintiffs' assertions, the alleged agreement is more akin to a real estate purchase agreement, as the Macdonald's interest in the Charleston Property would be effective upon the repayment to the Plaintiffs of the purchase price. Therefore, the Court finds

that such an agreement is subject to the statute of frauds and it is barred from enforcement by the statute of frauds.[6]

Furthermore, to the extent that, under *Marichris*, an alleged oral agreement could be considered for determining the intent of the parties at the time that the Deed was executed, based upon the evidence in this case, the Court finds no such agreement or "meeting of the minds" was reached between Plaintiffs and Defendant. [7]

First, unlike the Virginia Property and Miami Property, it is significant that, contrary to prior practices, there was no written agreement between the parties for the Charleston Property. Mr. Furlow, who handled all of the arrangements for the Plaintiffs regarding the purchase of the properties with the Macdonalds, spent his career in real estate development. As evidenced by the fact that he required signed written agreements with the Macdonalds for the other properties, Mr. Furlow was knowledgeable in and capable of protecting his and his wife's interests in real estate transactions. Plaintiffs had numerous opportunities to memorialize any alleged agreement at the time of the purchase, including withholding the Deed, denoting each party's interest on the Deed itself, entering a written agreement in a similar fashion as the prior properties, or getting an acknowledgement of debt (i.e. a promissory note or IOU) from the Macdonalds.  Further, the Court notes that for several years after the purchase, there is no evidence that Plaintiffs took action to memorialize or otherwise enforce the alleged oral agreement even after the Virginia Property sold for significantly less than the price the parties expected or even after the Macdonalds failed to obtain an independent mortgage loan. In fact, Plaintiffs' only efforts to enforce the alleged oral agreement appears to be the filing of this proceeding after Mrs. Macdonald's removal from the

---

[6]     *See Windham v. Honeycutt*, 302 S.E.2d 856, 856 (S.C. 1983) (noting that a real estate contract or any modification thereof is subject to the statute of frauds).

[7]     Similarly, as the Court finds there is a lack of clear evidence of an oral agreement, the Court does not find any basis to permit enforcement of an oral agreement based upon a partial performance.

Charleston Property by DSS and nearly simultaneously with her initiation of Family Court proceedings. Even under that circumstance, Mrs. Macdonald consented to and the Family Court awarded Defendant exclusive possession and use of the property. Considering how diligent Plaintiffs were in documenting their agreements with the Macdonalds for the prior properties, the lack of any writing or documentary communication regarding an agreement, and in light of their desire to help with Mrs. Macdonald's condition, supports Defendant's testimony that there was no such agreement that the Macdonalds' interest in the Charleston Property was, at the time of its purchase, conditioned upon a contribution to or repayment of the purchase price.

Second, there is no evidence which disputes that at the time of the execution of the Deed, all parties intended that the Macdonalds own an equal share of the property and have its exclusive use and possession as their family residence. While both Plaintiffs testified that they saw the Charleston Property as an investment, Mrs. Furlow testified that she never intended to receive a financial benefit from the Charleston Property. Further, the totality of the evidence convinces the Court that Plaintiffs provided assistance to the Macdonalds due to Mrs. Macdonald's condition and with the ultimate goal of gifting the entire property to them in a similar fashion as Plaintiffs had with Mrs. Macdonald's sister.[8] Mrs. Furlow confirmed that this was contemplated by Plaintiffs at the time of the purchase and move but that the Macdonalds had not "reached the point" where Plaintiffs would quitclaim their entire interest in the Charleston Property. Conversely, Defendant testified that his understanding was that Plaintiffs were to make a gift upon the Macdonalds finding their final "dream" home, which Defendant indicated was the Charleston Property. Plaintiffs' long-term history of support for the Macdonalds and their children, including the establishment of a

---

[8] Any variation in the timing of the circumstances between the Macdonalds and Mrs. Macdonald's sister can be reasonably inferred to be due to Ms. Macdonald's condition and the Macdonalds' limited resources.

trust and providing assistance with housing and the educational expenses of the children, support this finding.

Third, the circumstances surrounding the Macdonalds' move to South Carolina also suggest that their interest in the Charleston Property was not conditioned upon their equal contribution to the purchase price. Defendant testified that he was encouraged to move to South Carolina based upon the Plaintiffs' representations of the purchase of a very nice house with deep water access. The evidence indicates that the Macdonalds and Plaintiffs participated in selecting a home for the Macdonalds near the Plaintiffs. Plaintiffs provided no contrary testimony regarding the motivation for the Macdonalds to move to South Carolina, so close to the Plaintiffs. Defendant further testified that he left behind better employment opportunities in Virginia to move to South Carolina.[9] The Court finds credible Defendant's testimony indicating that he would not have been able to obtain a mortgage loan for between $300,000 to $600,000, the amount necessary to contribute one-half of the purchase price of the Charleston Property, especially considering the Macdonalds' income was limited to Defendant's disability retirement income of $30,000 a year, and Mrs. Macdonald had not been employed since 2008 and continued to suffer from substance abuse problems. Without a written agreement, it is unclear and unproven that any alleged oral agreement was communicated to or accepted by Defendant. In fact, Defendant testified that he had advised Mr. Furlow not to include his name on the deed for the Charleston Property but that Plaintiffs insisted he be on the deed in order to "appreciate the property."

Without a writing evidencing an agreement which is contrary to the presumption of the Deed, the Court is presented with contradictory self-serving testimony from each side as to whether there was such an agreement between the parties. In such situations, the Court relies upon the

---

[9]     Defendant specifically testified that his background was in federal government contracting and that there were very few federal contracting jobs in the Charleston area as compared with northern Virginia.

determination of credibility of witnesses and other evidence in light of the circumstances to determine if the burden of proof is met. Plaintiffs, as the party asserting an alleged oral agreement, have the burden of proof. *See Pertuis v. Front Roe Rests., Inc.*, 817 S.E.2d 273, 283 (S.C. 2018) (holding that the party asserting an oral agreement has the burden of proving its existence). Based on the evidence presented, Plaintiffs have failed to demonstrate an oral agreement with Defendant regarding his contribution to the purchase price of the property.

While not binding precedent, the Court finds persuasive a similar recent opinion from the Supreme Judicial Court of Maine, *Strand v. Velandry*, 228 A.3d 157 (Me. 2020). In *Strand*, a boyfriend, who was well-versed in finance and real estate, paid the entire purchase price of a home that was titled in his name and his girlfriend's name as tenants in common. *Id.* at 159–60. After the couple broke up, the boyfriend brought a partition action, alleging that he had an oral agreement that the girlfriend's interest was conditioned on her payment of 50% of the purchase price. The girlfriend testified that the boyfriend only first asserted an alleged agreement after they had broken up and he was facing money issues, which the trial court found credible. *Id.* In finding that the presumption of equal shares was not rebutted, the trial court "inferred that the lack of a writing stating that [the girlfriend's] interest was conditional was evidence of [the boyfriend's] intent to give [the girlfriend] an unconditional interest in the property when he included her on the deed." *Id.* at 160–61. The Supreme Judicial Court of Maine affirmed, finding the trial court did not err in applying the presumption of equal ownership under those circumstances. *Id.* at 161. The Court finds the facts and circumstances in this case to be similar.

Further, the Court does not accord great weight to Mrs. Macdonald's 2018 quitclaim deed as evidence of the parties' intent at the time of the purchase of the Charleston Property. The quitclaim deed was made during a period when Mrs. Macdonald was suffering from substance

16

abuse problems and was in the care and support of the Plaintiffs and after Plaintiffs had retained counsel and initiated the present proceedings in State Court.[10]

Therefore, while Plaintiffs paid all of the purchase price for the Charleston Property, it appears that it was intended by all to be equally owned and used and possessed exclusively by the Macdonalds and their children as their residence. After considering the weight and credibility of the evidence, Plaintiffs have failed to demonstrate that the Macdonalds' interest in the Charleston Property was conditioned at the time of the purchase on their payment of one-half of the purchase price of the property.[11] For the reasons stated above, the Court finds that Plaintiffs have failed to rebut the presumption under the Deed that Plaintiffs, Defendant and Mrs. Macdonald, as tenants-in-common, were to have equal shares in the Charleston Property. Therefore, the Court finds that Plaintiffs hold a 75% interest (based upon their initial 50% interest and the 25% they acquired from Mrs. Macdonald) and Defendant holds a 25% interest in the Charleston Property.

### Division of Expenses

Plaintiffs assert that during this litigation, they have paid multiple recent expenses for the Charleston Property including property taxes, insurance payments and homeowners' association dues.[12] Specifically, Plaintiffs asserts they made the following payments for expenses on the

---

[10]   It is noteworthy that the quitclaim deed was not recorded as long as the Macdonalds had the opportunity to reconcile.

[11]   Ultimately, while the Court finds Plaintiffs have not overcome their burden regarding the presumption of equal shares in the Deed, the Court nonetheless also finds, based upon the weight and credibility of the evidence presented, including the testimony of Defendant; the lack of a written agreement or any action by Plaintiffs to enforce such an alleged agreement for multiple years after the closing of the Charleston Property; the pattern, nature and history of Plaintiffs' financial support to the Macdonalds; and the circumstances surrounding the Macdonalds' move from Virginia to South Carolina, that the parties intended a gift to Mrs. Macdonald and Defendant of a 25% interest each in the Charleston Property when the Deed was executed. Nevertheless, the Order results in Plaintiffs receiving 75% of the value from a sale of the Charleston Property.

[12]   Unlike the facts in *Marichris*, in this case, there was no mortgage loan owed by the owners of the property.

Charleston Property and seeks reimbursement from Defendant in proportion to his ownership interest:

- Payments for Property Insurance Premiums in 2019 in the amount of $4,273.00
- Payment of the 2018 Property Taxes in the amount of $6,670.49
- Payment of the Homeowners' Association Dues in 2019 in the amount of $367.50

Defendant does not dispute that Plaintiffs made these payments for the benefit of the Charleston Property.[13] A co-tenant is generally entitled to a proportionate contribution for the payment of a property's taxes, insurance and other expenses. *See Watson v. Little*, 79 S.E.2d 384, 388 (S.C. 1953). Therefore, the Court finds that Defendant is responsible for one-quarter of these expenses paid by the Plaintiffs in the amount of $2,827.75 and any proceeds Defendant receives from the sale of the Charleston Property shall be reduced by this amount and paid to Plaintiffs.

### Partition

Section 15-61-10 of the South Carolina Code provides that all tenants in common who hold property in common "shall be compellable to make severance and partition of all such lands, tenements and hereditaments." Section 15-61-50 of the South Carolina Code provides that:

> The court of common pleas has jurisdiction in all cases of real and personal estates held in joint tenancy or in common to make partition in kind or by allotment to one or more of the parties upon their accounting to the other parties in interest for their respective shares or, in case partition in kind or by allotment cannot be fairly and impartially made and without injury of any of the parties in interest, by sale of the property and the division of the proceeds according to the rights of the parties.

"The partition procedure must be fair and equitable to all parties of the action." *Zimmerman v. Marsh*, 618 S.E.2d 898, 900 (S.C. 2005). It is not disputed that, in this matter, a partition in kind is neither practicable nor expedient. To the degree that Defendant's creditors may have an interest

---

[13] The evidence indicates that Defendant wrote a check to Mrs. Macdonald in December of 2018 in the amount of $1,619.05 with the memo line stating, "Captain Kidd 2018 Taxes." The amount of the check appears to be approximately one-quarter of the 2018 property taxes due for the Charleston Property. It does not appear that the check was cashed by Mrs. Macdonald or any other party.

in the net sales proceeds, a sale of the Charleston Property based upon orders of the Court is appropriate in this matter.

For the purpose of this trial, the parties stipulated that the present value of the Charleston Property is $1.2 million. The Court is concerned about maximizing the value of the property from a judicial sale. A sale that produces a significantly less purchase price would not be beneficial to Plaintiffs, Defendant or Defendant's creditors. Therefore, the Court finds that the parties, including the Chapter 13 Trustee, shall have ten days from the entry of this Order to discuss and determine an agreed-upon procedure for the sale of the Charleston Property. Within ten days after the entry of this Order, the parties shall file a correspondence indicating whether the parties have agreed upon procedure to sell the property and the terms of that proposed procedure. If the parties are unable to mutually agree on a procedure for the sale of the Charleston Property, the Court will address whether a judicial sale is necessary in this matter and the procedures required to accomplish such a sale at a hearing to be separately noticed.

### Attorneys' Fees

Both parties seek an award of the attorneys' fees incurred in this adversary proceeding pursuant to § 15-61-110 of the South Carolina Code, which provides that "[t]he court of common pleas may fix attorneys' fees in all partition proceedings and, as may be equitable, assess such fees against any or all of the parties in interest." The award of attorney's fees in a partition action is within the sound discretion of the court. *See Smith v. Hawkins*, 175 S.E.2d 824, 826 (S.C. 1970). In this matter, the Court finds the conduct of the parties to be due, in part, to the familial breakdown caused by the death of Mrs. Macdonald. In such circumstances, the Court finds each party should be responsible for their own attorney's fees according to their respective fee agreements and that

the collection of such fees shall be independent of the sale of the Charleston Property. Therefore, both parties' requests for an award of attorneys' fees are denied.

## CONCLUSION

For the foregoing reasons, the Court finds Plaintiffs have not rebutted the presumption of equal shares between co-tenants when the Deed was otherwise silent. Therefore, Plaintiffs hold a 75% interest and Defendant holds a 25% interest in the Charleston Property. Defendant is liable in the amount of $2,827.25 to Plaintiffs for reimbursement of his portion of certain expenses paid by the Plaintiffs for the Charleston property. This amount shall be deducted from the proceeds to be received by Defendant after any sale of the Charleston Property and paid to Plaintiffs.

Further, the Charleston Property shall be sold. The parties shall file correspondence with the Court as to a proposed mutually-agreed-upon procedure for the sale of the Charleston Property within ten days after the entry of this Order. If the parties are unable to agree upon a proposed procedure to sell the Charleston Property, the Court will address whether a judicial sale of the Charleston Property is necessary, and the procedures required to accomplish such a sale at a hearing to be separately noticed.

Finally, the Court denies both parties' requests for an award of attorneys' fees.

**AND IT IS SO ORDERED.**

Columbia, South Carolina
September 15, 2020